IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                          Criminal No. 3:22-cr-26-01

JOSHUA B. ROMANO,

Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Defendant Joshua Brian Romano's MOTION FOR RELEASE PENDING APPEAL (ECF No. 113) ("the Motion"). For the reasons set forth below, the Motion will be denied.

## BACKGROUND

### I. Factual Background

The facts of the case are as presented in the evidence at trial. They are fully supported by the evidence of record.

Romano owned and operated multiple businesses focused on rehabilitating and renovating houses to include CNJ Ventures, Cobblestone Development Group, and Falling Water Construction and Design. Tr. 35-36, 115, 565, 589. As a part of his business, Romano borrowed funds from Lender A through several so-called "hard money" loans (loans that had shorter terms and higher interest rates than conventional loans) to purchase and rehabilitate the houses for eventual re-sale. Tr. 313-14, 316. To secure the loans, Romano

approved for submission to Lender A sworn statements that, inter alia, represented that the purpose for the loan was to purchase and/or rehabilitate the property listed at the address set forth on the individual loan document. Gov't Ex. 5, 6, 9, 13, 14, 18, 18A, 18B, 18C, 28, 29, 32, 33.

Once a loan agreement was executed, the funds supplied by Lender A were held in an escrow account managed by the Law Firm S. Page Allen & Associates ("SPA") where the co-defendant, Lindsey Passmore, worked as a paralegal. Tr. 315-16. Disbursements were made as work progressed. To withdraw money for each property, Romano or one of his employees (acting on behalf of Romano) would contact Passmore with the identity of the property for which the funds would be used, the amount sought, and the purpose for the withdrawal. See, e.g., Gov't Ex. 21. Using this information, Passmore would then get authorization from Lender A to disburse the funds for the project, and the funds would be disbursed to Romano for use on that property for that specified purpose. Tr. 206-07; see, e.g., Gov't Ex. 21 and 22.

Beginning in approximately 2015, Romano convinced Passmore to wire escrowed funds designated for use on one property to be used for other projects. Tr. 211-13. That was in violation of the loan affidavits and agreements, and those uses were not authorized by the lender. Tr. 213, 216, 321, 333-40. Passmore did this on at least four occasions at Romano's direction. Tr. 219-23, 228-32. At

2

one point, when Lender A asked Passmore for a balance sheet for each property, she, with Romano's blessing and knowledge, sent him a report reflecting false balances for each property. Tr. 247-51; Gov't Ex. 39. Lender A believed that hundreds of thousands of dollars remained for six different properties when, in reality, there was almost no money remaining in the escrow account. Tr. 49-51, 343; Gov't Ex. 3. By the end of scheme, Romano and Passmore had fraudulently taken $1,206,953.27 from the escrow account. Tr. 310, 622. Lender A and SPA eventually uncovered the fraud, and Romano falsely maintained that Passmore and Page Allen (who owned SPA) had stolen the money without his knowledge. Tr. 52, 84, 139, 343.

Romano filed for Chapter 7 bankruptcy in October 2018 where he named Lender A as one of his creditors. Gov't Ex. 41; Tr. 358-61. On August 17, 2020, Lender A initiated an adversary proceeding, claiming that Romano could not discharge his debt through bankruptcy because the funds in question had been obtained by false pretenses and embezzlement. Gov't Ex. 44; Tr. 377-81. In response, Romano filed (through his attorney) an answer that falsely alleged that he only used the escrowed funds for improvements to the designated properties. Gov't Ex. 45; Tr. 381-83. On July 13, 2021, Romano testified in the bankruptcy proceeding and falsely stated, while under oath, that he did not make any of the fraudulent draw

3

requests and that Passmore and Allen were to blame. Gov't Ex. 48; Tr. 394-95, 404-05. Based on a completely different record than was developed in this Court, Romano ended up prevailing in the bankruptcy court, and his debt was discharged. Gov't Ex. 46 and 47.

## II. Procedural Background

A grand jury issued a seven-count INDICTMENT (ECF No. 1) against Romano and Passmore on March 15, 2022. On May 5, 2022, a grand jury issued a SUPERSEDING INDICTMENT (ECF No. 34) which added two counts against Romano. A jury trial was held October 17-20, 2022. The jury found Romano guilty of one count of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349, and three counts of Wire Fraud, in violation of 18 U.S.C. § 1343. ECF No. 60. However, the jury acquitted Romano of two counts of Wire Fraud, in violation of 18 U.S.C. § 1343, and one count of False Statement Under Oath in Relation to Bankruptcy, in violation of 18 U.S.C. § 152(2). Id.[1]

On January 19, 2023, Romano was sentenced to 108 months' imprisonment on each count to be served concurrently, three-years' supervised release, a $400 special assessment, and $1,206,953.27 in restitution. ECF No. 106. Seven days later, Romano filed his

---

[1] COUNT SIX and COUNT EIGHT of the SUPERSEDING INDICTMENT were dismissed by motions of the United States. ECF Nos. 53 and 57.

Notice of Appeal to the Fourth Circuit. ECF No. 108. He reported to FCI Petersburg on March 21, 2023 and remains in custody there.

On March 9, 2023, Romano (through his attorney) filed the Motion and a supporting memorandum of law. ECF Nos. 113 and 114. On March 16, 2023, the United States filed a response opposing Romano's release pending appeal. ECF No. 116. Romano did not file a reply, and the time to do so has expired. Local Crim. R. 47(F)(1). After an initial review of the papers, the Court ordered further briefing on Romano's sufficiency-of-the-evidence argument, ECF No. 117, and the parties filed their respective supplemental brief, response, and reply according to schedule. ECF Nos. 120, 121, and 122.

In the Motion, Romano gave notice that he is not requesting a hearing on the matter and defers to the Court on whether a hearing is necessary. ECF No. 113 at 1 n.1. The Court has determined that a hearing is unnecessary and thus is deciding the Motion on the submitted papers.

## III. Parties' Arguments

Romano seeks release pending appeal under 18 U.S.C. § 3143(b). ECF No. 113 at 1. In his view, the "dispositive question" is whether the issues that he plans to raise on appeal are substantial questions, and he contends that each one is. ECF No. 114 at 2-3.

The first issue is that the United States failed to show beyond a reasonable doubt that Romano had the specific intent to

5

defraud because there was no direct evidence showing that he asked for the wires, had received the accounting ledgers, or that he was trying to hide his actions while there was evidence that other people had access to the account and requested funds and that he had numerous other accounts with no ledger imbalances. Id. at 5-6; ECF No. 121 at 2-3. Romano also points to his acquittal by the jury on three counts to argue that the case was "extremely close." ECF No. 121 at 1.

Second, Romano argues that the Court erred when it admitted a photograph of Romano and witness James Dillon in front of a whiteboard containing information about the properties at issue (Gov't Ex. 4) because the whiteboard contained hearsay and the Government used it for the truth of the matter asserted. ECF No. 114 at 6.

Third, Romano contends that the Court erred when it sustained the United States' objection to asking Allen about a 2009 reprimand from the Virginia State Bar in order to show bias. ECF No. 114 at 7. Discrediting Allen was allegedly important to Romano's defense because Allen helped Passmore in creating the ledgers for the six properties at issue and Allen potentially had a motive to lie because she was facing a bar investigation. Id.

Fourth, Romano believes that the Court erred by not allowing defense counsel to ask Passmore whether she had received any emails from Romano that corroborate her accusations that he agreed to

6

carry out the scheme with her because it goes to whether there is evidence that Romano had the specific intent to defraud. ECF No. 114 at 7-8.

Fifth, Romano argues that the Court erred when it did not allow the defense witness John Bedi, Romano's lawyer in the bankruptcy case, to testify about the discrepancies in the ledgers and to admit a ledger into evidence that "showed sloppy or made-up accounting." ECF No. 114 at 8. Romano contends that it was unnecessary to authenticate the ledger because it was being used to show what SPA was offering to others "regarding the alleged contents of the bank account as it pertained to the subject properties" rather than to show what was actually in the bank accounts. Id. at 8-9. Romano describes the exclusion of this evidence as "devastating" because a core portion of his defense was that the ledgers were not created contemporaneously and thus were used to cover up the fraud by SPA. Id. at 9. Romano concludes that these errors cumulatively prejudiced his defense and that resolving these questions in his favor would result in a new trial. Id. at 2, 9.

The United States takes the opposite view on each issue. First, the United States contends that Romano now poses a risk of flight because he is facing a nine-year sentence, "repeatedly perjured himself during his trial testimony," and because he no longer has the impending birth of his child as motivation to

7

remain. ECF No. 116 at 2-3. Additionally, the United States argues that Romano has failed to show by clear and convincing evidence that he is not a flight risk, so the Court should deny the Motion on this ground alone. Id. at 3.

The United States also argues that none of the issues that Romano plans to raise on appeal are likely to result in reversal. ECF No. 116 at 3. The United States contends that Romano omitted important context in his arguments, including that Passmore "unequivocally testified that she wired escrowed funds held by [SPA] to Romano at his urging" and that her testimony was corroborated by records and other witnesses' testimony. Id. at 3-4. Further, in its supplemental brief, the United States laid out the evidence, with specific citations to the record, that showed that Romano had the specific intent to defraud. ECF No. 120. Additionally, the United States does not believe that Romano's alleged defense could possibly succeed because he has not provided any evidence that Passmore and Allen took the funds or that Passmore falsely pled guilty to conspiring with him to commit wire fraud. ECF No. 116 at 4-5.

As for the alleged evidentiary errors, the United States generally argues that the abuse-of-discretion review standard will prevent the Fourth Circuit from overturning the Court's evidentiary rulings and that, even if they are overturned, the errors would be considered harmless. ECF No. 116 at 5. On the

8

specific evidentiary errors, the United States argues that the photograph with the whiteboard showing "dead" projects was not hearsay because Dillion only testified that "dead" projects were listed on the whiteboard and that Romano acknowledged that fact. Id. at 5-6. Second, the United States contends that the Court did allow Romano to cross-examine Allen regarding the pending bar investigation relating to this case and that the Court did not err when it did not allow Romano to ask about a bar investigation from 2009 because that investigation was too remote in time and substance to bear on Allen's credibility or her alleged bias in this case. Id. at 6-7. Third, the United States believes the Court was correct in not allowing defense counsel to ask Passmore on cross-examination whether there were e-mails corroborating her testimony that Romano directed her to embezzle funds because it "would have required Passmore to opine on whether certain evidence was or was not corroborating of her testimony." Id. at 7. Further, Passmore did testify that Romano did not use e-mail to make those requests. Id. Lastly, the United States argues that the ledgers accompanying Bedi's testimony were properly excluded because the defense counsel could not properly authenticate the records as is required under Fed. R. Evid. 901. Id. at 7-8.

9

## DISCUSSION

### I. Legal Standard

18 U.S.C. § 3143(b)(1) provides that a judicial officer can release "a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal" if two conditions are met: (1) if, "by clear and convincing evidence[,] . . . the person is not likely to flee or pose a danger to the safety of any other person or the community," and (2) "the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal, an order for a new trial, a sentence that does not include a term of imprisonment, or a reduced sentence" subject to certain parameters.[2] The second condition is divided into a three-part inquiry: (1) whether "the appeal is not taken for the purpose of delay"; (2) "whether the question presented on appeal is a 'substantial' one"; and (3) "if decided in favor of the accused, whether the substantial question is important enough to warrant reversal or a new trial on all counts for which the district court imprisoned the defendant." United States v. Steinhorn, 927 F.2d

---

[2] This provision will not allow the release of an individual who has been convicted of (1) a crime of violence, (2) a crime for which the maximum sentence is life or death, or (3) certain offenses involving controlled substances. 18 U.S.C. § 3142(f)(1). Romano does not fall under any of these provisions, so he is eligible to be released pending appeal if the two conditions above are met.

195, 196 (4th Cir. 1991). "Substantial question" is defined as "a 'close' question or one that very well could be decided the other way" and is determined on a case-by-case basis. Id.

## II. Analysis

### a. *Danger to Others and Community or Risk of Flight*

The Court has previously found on two occasions that Romano is not likely to flee and that he does not pose a danger to the safety of another person or the community.

Neither party disputes that Romano does not pose a danger, and his background does not contain any indication that he is a violent person. Thus, the Court finds that Romano does not pose a danger to the safety of any other person or the community.

As for the flight risk component of the statute, the United States claims that Romano now poses a risk of flight (as opposed to in January 2023 when the United States agreed Romano was not a flight risk) because he is facing a nine-year sentence and he "repeatedly perjured himself during his trial testimony, which is suggestive of a contempt for the justice system that would extend to Court orders." ECF No. 116 at 3. However, both of those facts were true following Romano's sentencing on January 19, 2023, and he did not attempt to flee before reporting to prison on March 21, 2023.[3] More evidently, Romano followed all conditions of release

---

[3] The United States also attempts to argue that Romano has an inconsistent parenting history, so it cannot be said that the

since the original indictment, and he reported to FCI Petersburg without issue. Accordingly, it cannot be said that Romano poses a risk of flight, so he meets this requirement for release.

### b. *Substantial Questions Likely to Result in New Trial*

As for the second condition, the United States does not argue that Romano is taking this appeal for the purpose of delay, and there is nothing in the record to suggest that is his purpose either. Accordingly, the Court finds that Romano has not appealed as a method to delay his imprisonment, especially considering that Romano is currently incarcerated. Rather, the issue comes down to whether Romano has raised substantial questions that, if resolved in his favor, would entitle him to a new trial. The Court finds that Romano has raised no substantial questions and will address each in turn.

### 1. Sufficient Evidence for Specific Intent to Defraud

Romano's first argument is that the United States failed to provide sufficient evidence to prove the element of specific intent to defraud beyond a reasonable doubt. ECF No. 114 at 5. Romano does not identify the specific convictions to which this argument

recent birth of Romano's child makes him less likely to be a flight risk. ECF No. 116 at 3 n.2. Seeing as though there is very little information on Romano's eldest son with whom he does not have contact or an explanation on why there is no contact, it is a stretch to say he is an inconsistent parent when he has very clearly been a present parent for his daughter as well as his estranged wife's children. PSR ¶¶ 105-07. Accordingly, the Court can place no reliance on this argument.

12

pertains, but the instructions given to the jury explain that one element of Wire Fraud (COUNTS THREE through FIVE) is "that the defendant, knowingly and willfully participated in the scheme and artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud." ECF No. 61 at 41 (Jury Inst. No. 46). Additionally, Romano's initial argument on this ground centers around the sending of the wires rather than his agreement with Passmore.[4] ECF No. 114 at 5-6. Accordingly, the Court will construe this argument as Romano challenging the sufficiency of the evidence as to COUNTS THREE through FIVE.

To prevail on a sufficiency-of-the-evidence challenge on appeal, a defendant must overcome "a heavy burden." United States v. Arcila-Pedraza, 293 F. App'x 240, 241 (4th Cir. 2008) (citing United States v. Beidler, 110 F.3d 1064, 1067 (4th Cir. 1997)). "Sufficiency review essentially addresses whether 'the government's case was so lacking that it should not have even been submitted to the jury.'" Musacchio v. United States, 577 U.S. 237, 243 (2016) (quoting Burks v. United States, 437 U.S. 1, 16 (1978)). The reviewing court must answer "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

---

[4] Romano's supplemental response (ECF No. 121) did mention the conspiracy with Passmore, but the Court will not consider that here because it was raised for the first time in Romano's supplemental response brief.

essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 314-15 (1979). The court "does not review the credibility of the witnesses and assumes that the jury resolved all contradictions in the testimony in favor of the Government." Arcila-Pedraza, 293 F. App'x at 242 (citing United States v. Romer, 148 F.3d 359, 364 (4th Cir. 1998)).

Romano has failed to show that his sufficiency-of-the-evidence challenge will be a close question on appeal because he has not overcome the heavy burden imposed upon him. Looking at the evidence and testimony presented during trial in the light most favorable to the United States, a rational trier of fact readily could have found that Romano had the specific intent to defraud[5] required for conviction of COUNTS THREE through FIVE (which the jury did find in this case).[6]

The United States provided ample evidence through testimony, bank records, and accounting ledgers showing that Romano directed

---

[5] As defined in the jury instructions, "'[i]ntent to defraud' means to act knowingly and with the specific intent to deceive for the purpose of causing some financial or property loss to another." ECF No. 61 at 51. "The intent to repay eventually is irrelevant to the question of guilt for fraud." Id.

[6] In addition to the "specific intent to defraud" element (Second Element in the jury instructions), the United States also had to prove beyond a reasonable doubt that "there was a scheme or artifice to defraud" (First Element) and that the scheme used interstate wires (Third Element). ECF No. 61 at 41. Romano only challenges the Second Element, but the record shows that the United States met the other two elements beyond a reasonable doubt.

14

Passmore to take money designated for certain specific properties and claim it was used on other specific properties, which is in direct violation of the loan agreements. See, e.g., Gov't Ex. 18 and 18A. For example, Passmore testified that Romano told her that he wanted to use funds designated to "2000 Prince George" as a credit line to fund construction on other properties because he thought that he should be able to use the money as he desired. Tr. 211-12. Similarly, Passmore testified that she made Romano aware that she would be out on maternity leave, so they needed to get the accounting in order, and Romano replied that he knew and was taking care of it, which shows that he was acting knowingly. Tr. 233-34. On another occasion, Passmore informed Romano that there was not enough money attributed to the Prince George property to complete a requested transfer, and Romano asked Passmore how they were going to cover it up and consented to Passmore's plan. Tr. 239-41.

Similarly, Kyle Benusa, a consultant who did work for Romano in 2017, testified that Romano was not surprised when Benusa informed him that there was no money left in several escrow accounts and provided a number of varying explanations for why that was so. Tr. 52-53. Benusa also testified that Romano told him that Lender A knew that he was spending money on other projects, but Lender A testified that he did not recall telling Romano that he could use the escrowed funds for other properties. Tr. 55, 321,

15

333-40. Assuming in the United States' favor that the jury found Passmore's, Benusa's, and Lender A's testimony credible, it shows that a jury reasonably could conclude that Romano had the necessary specific intent under COUNTS THREE through FIVE.

Further, the accounting records provided by the United States showed that none of the funds went to Passmore or SPA, so it was reasonable for a jury to infer that the fraudulent wires were for Romano's benefit and thus that he had the specific intent to defraud. See Tr. 669-73. While there was no direct evidence in the form of written emails or recorded conversations showing that Romano directed Passmore to conduct the fraudulent wires, the jury was permitted to make reasonable inferences from circumstantial evidence, and they ultimately found that Romano did have the specific intent to defraud. ECF No. 61 at 7. Accordingly, there does not appear to be a close question to as to whether Romano can meet his heavy burden for his sufficiency-of-the-evidence argument.[7]

---

[7] Romano argues that the jury's verdict of acquittal on three counts makes this a close question, but the decisions from the Supreme Court of the United States and the U.S. Court of Appeals for the Fourth Circuit make clear that "the jury's verdict that the evidence was insufficient on another charge" should not be considered when evaluating the sufficiency of the evidence on a different charge. United States v. Mackins, 32 F.3d 134, 138 (4th Cir. 1994) (citing United States v. Powell, 469 U.S. 57, 67 (1984)). Accordingly, the Court finds no merit in Romano's argument and will not consider the fact that the jury acquitted Romano on three counts as probative of whether a close question exists as to the counts at issue.

Romano claims that the evidence equally supports his defense that he was not aware of the wires by Passmore because he was "overwhelmed by his core business," ECF No. 114 at 5, but, viewing the evidence in the light most favorable to the United States, there is not sufficient evidence to support that contention. While it is true that other individuals made wire requests to the account and that Romano was not provided with an accounting ledger for the properties before December 2017, there is no other evidence favoring Romano's theory of events because there is no evidence showing that any other individual other than Romano and Passmore knew the details of the fraudulent scheme and its implementation. Neither Passmore nor Allen received any of the funds. Tr. 140, 255. Nor does the record remotely support Romano's argument that the purloined money went to them. Further, at least three individuals (Passmore, Benusa, and Corey Booker) testified in some manner that Romano either knew about the fraudulent scheme or did not seem surprised when it was mentioned to him. Tr. 52-53, 211-13, 235-36, 295, 437-38. Thus, there was sufficient evidence for the jury to accept the United States' version of events over Romano's.

Accordingly, this is not a substantial question that would entitle Romano to release pending appeal.

17

### 2. Whiteboard Photograph as Hearsay

Romano's first evidentiary challenge relates to Government Exhibit 4, which is a picture of Romano and Dillon standing in front of a whiteboard that contains writing related to Romano's business. During the United States' direct examination of Dillon, defense counsel objected to the admission of the photograph, arguing that the writing on the whiteboard was hearsay and that it could not be admitted through the business record exception (Fed. R. Evid. 803(6)) because Dillon was not a keeper of the records. Tr. 81:20-83:1. The Court allowed the photograph to be admitted as evidence because the United States represented that it was not being offered for the truth of the matter asserted. Tr. 82:16-83:1. Once the photograph was admitted, Dillon testified that no work had been done at one of the properties listed on the board, "2000 Prince George." Tr. 84:22-85:8. Defense counsel again objected, arguing that the photograph was now being offered for the truth of the matter asserted because Dillon was explaining "what . . . all the things on the list mean and what was intended by the[m]." Tr. 85:9-19. The Court then allowed the United States to lay a foundation for what constituted a "dead project," and Dillon simply stated that the bottom left portion of the board was used to note dead projects. Tr. 85:20-86:15.

On appeal, the reviewing court "reviews a trial court's rulings on the admissibility of evidence for abuse of discretion,

18

and will only overturn an evidentiary ruling that is arbitrary and irrational." United States v. Moss, 445 F. App'x 632, 634 (4th Cir. 2011) (quoting United States v. Cole, 631 F.3d 146, 153 (4th Cir. 2011)) (alterations omitted); see also United States v. Mason, 52 F.3d 1286, 1289 (4th Cir. 1995) (describing the role of the reviewing court as determining whether the lower court's exercise of discretion was "arbitrary or capricious"). Additionally, the reviewing court will "look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." United States v. Udeozor, 515 F.3d 260, 265 (4th Cir. 2008). Even if the court finds that an error has occurred, "a conviction will not be overturned on account of an erroneous evidentiary ruling when that error is deemed harmless within the meaning of Federal Rule of Criminal Procedure 52(a)." Cole, 631 F.3d at 154. An error is harmless when it can be said "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997).

Based on the above standards of review, it is not a "close question" as to whether the Court erred in admitting Government Exhibit 4. "Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted." Anderson v. United States, 417 U.S. 211, 219 (1974). The writing

19

on the whiteboard, however, was not offered for the truth of the matter asserted. It was offered to show that Romano was aware that there were "dead projects," but the testimony did not go further than that because the United States pivoted the direction of the testimony when defense counsel objected. Thus, a reviewing court is not likely to find that the evidentiary ruling was in error. Additionally, there was other evidence submitted showing that Romano was aware that he had dead projects. See Tr. 98-99, 211-12. Accordingly, this evidentiary challenge is not a substantial question that would entitle Romano to be released pending appeal.

### 3. Cross-Examination of Allen

Romano's second evidentiary challenge relates to his alleged inability fully to cross-examine Allen about potential bias because of the pending state bar investigation. ECF No. 114 at 7. Before trial, the United States filed a MOTION *IN LIMINE* TO BAR CROSS-EXAMINATION ON PUBLIC REPRIMAND BY VIRGINIA STATE BAR (ECF No. 51) that asked the Court to prevent questions relating to a reprimand from the Virginia State Bar against Allen in 2009 because, under Fed. R. Evid. 608(b), it was not probative of her character for truthfulness or untruthfulness. ECF No. 51. After hearing argument on the matter, the Court granted the Motion, finding that this line of cross-examination did not fall under Fed. R. Evid. 608(b) because findings of fact and the citation for a conflict-of-interest violation did not bear on Allen's character

20

for truthfulness or untruthfulness. Tr. 152:22-153:14. However, during cross-examination, Romano was allowed to ask and did, in fact, ask Allen about a different then-pending bar investigation relating to the offenses at issue. Tr. 163:4-165:3.

Under Fed. R. Evid. 608(b), on cross-examination, a party may inquire "into [specific instances of a witness's conduct if they] are probative of the character for truthfulness or untruthfulness." However, it is up to the discretion of the court to allow such inquiry. Fed. R. Evid. 608(b). Here, defense counsel wished to ask Allen about a bar reprimand that she had received over a decade earlier for conduct in 2006 concerning diligence and conflicts of interest in real estate contracts. ECF No. 51-1. That conduct spoke to Allen's failure to inform her client of a potential conflict of interest, but it did not suggest that she intentionally lied to her client or other conduct from which one could infer that she has the character for untruthfulness. Rather, it showed a lack of diligence by Allen, which did not give defense counsel a reason to inquire about it on cross-examination under Fed. R. Civ. 608(b). Additionally, defense counsel argued that this line of questioning would show that Allen was biased. Tr. 148-49. However, the conduct underlying the previous bar reprimand occurred in 2006 and thus was too attenuated from the instant offense to allow the jury to draw an inference on bias, particularly when it was merely speculative that (1) Allen would

21

receive a lesser punishment if Romano was found guilty and (2) the investigators would take her prior reprimand into account in deciding a punishment. See United States v. Mikhel, 889 F.3d 1003, 1048 (9th Cir. 2018) (finding there was no Rule 608(b) error when "the proposed testimony's relevance was speculative, attenuated, and convoluted"). Accordingly, because the reviewing court is not likely to find this evidentiary ruling to be in error, it cannot be considered a substantial question to justify Romano's release pending sentencing.

### 4. Cross-Examination of Passmore

The third evidentiary issue that Romano raises relates to the cross-examination of Passmore. Romano argues that the Court erred by not allowing defense counsel to ask Passmore "whether she ever received an email from Mr. Romano agreeing to defraud" Lender A. ECF No. 114 at 7. Defense counsel specifically asked, "Do you have any e-mail in the six to eight months that corroborates your accusations that Mr. Romano agreed to do this with you or that . . . ?" Tr. 279:11-14. The Court then prevented defense counsel from asking the question because it required Passmore to give her opinion about the meaning of emails sent by Romano. Tr. 279:15-20. However, defense counsel was allowed to ask, and did ask, Passmore if Romano had ever asked her via email to send wire transfers, to which she replied, "No." Tr. 280:16-25. Thus, Romano's argument that he was not allowed to show that "there was

22

no written communication between him and [Passmore] regarding draws or ledgers" is simply a misstatement of the record because he indeed was able to ask whether such emails existed. Accordingly, this is not a close question of law that would serve as grounds to release Romano pending appeal.

### 5. Ledgers with Bedi's Testimony

Romano's final evidentiary challenge concerns a two-page ledger allegedly prepared by SPA for the property "3414 West Franklin" that was marked as Defense Exhibit 4 (ECF No. 58-2) during Bedi's testimony[8] on the third day of trial. Romano offered to enter this document into evidence to refute unchallenged ledgers offered by the United States which were offered to accurately depict all of the prior transactions. The United States objected to the admission of the ledgers in Bedi's possession on the ground that it was not authentic.[9] Tr. 502:2-9, 504:13-24. The Court then heard testimony from both Passmore and Allen outside the presence of the jury to decide whether Defense Exhibit 4 was an authentic

---

[8] Bedi was Romano's lawyer during on the bankruptcy case. He obtained the ledger produced by SPA at some point during that matter.

[9] The United States also objected to the admission of Defense Exhibit 4 on the ground that it was not relevant. Tr. 501:15-22. However, the Court sustained the objection on the basis of authenticity, Tr. 537:21-538:2, and Romano's current arguments center around authenticity. ECF No. 114 at 8-9. Accordingly, the Court will not address the relevance portion of the objection in this Memorandum Opinion.

23

ledger. Passmore and Allen identified two discrepancies with the proffered document: (1) the formatting of the document was inconsistent with the standard ledger because it was missing the "total miscellaneous items" calculation; and (2) the print-dates on the bottom of the two pages did not match. Tr. 511-21, 523-30. These discrepancies accordingly signaled to Allen and Passmore that each page was from a different ledger so that the whole was not an authentic document. Tr. 516:24-517:2, 529:24-25. Additionally, during argument on the objection, the United States pointed out that the amounts listed on the sheets did not add up to the total amount listed on the bottom of the reports and that the chain of custody from Allen to Bedi could not be established. Tr. 530:16-21, 535:11-23. Presented with this record, the Court sustained the objection, finding that the reliable testimony by witnesses with knowledge of the document show that Defense Exhibit 4 was "not a complete document of what it purports to be, a single ledger balance report for 3414 West Franklin." Tr. 537:21-538:2.

Under Fed. R. Evid. 901(a), "the proponent [of an item of evidence] must produce evidence sufficient to support a finding that the item is what the proponent claims it is." While "[t]he factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury," the trial court is tasked with serving as a "gatekeeper" to assess "whether the proponent has offered a satisfactory foundation from which the

24

jury could reasonably find that the evidence is authentic." United States v. Vidacak, 553 F.3d 344, 349 (4th Cir. 2009). To properly authenticate a document for admission, the proponent must make a prima facie showing that the document is what it claims it to be. Id. This can be accomplished through the testimony of a witness with knowledge or by examining the distinctive characteristics of an item. Fed. R. Evid. 901(b)(1) and (4). Authenticity can also be established through the chain of custody, which shows that "the condition of [the] real evidence . . . has not been substantially altered." United States v. Bagguley, 838 F.2d 468, at *3 (4th Cir. 1987) (unpublished).

Here, it is not a close question as to whether Defense Exhibit 4 could be properly authenticated because it was clear that there was not "sufficient proof that the evidence is what it purport[ed] to be and [had] not been altered in any material respect." United States v. Summers, 666 F.3d 192, 201 (4th Cir. 2011). This is true for four reasons. First, the two pages were not printed at the same time because, as Allen testified, a multi-page report from the accounting program that was printed at the same time would have matching time stamps, but these two pages did not. Second, unlike the other ledgers submitted into evidence, Defense Exhibit 4 was missing a total amount for the miscellaneous items section on either page, which brings into question whether the two pages constituted an integrated document. ECF No. 58-2. Third, the ending

25

balance on the second page of Defense Exhibit 4 ($222.17) is not the ending balance of the deposits and withdrawals listed on the two pages when they are re-calculated ($45,054.62), which further calls into question the authenticity of the integrated document. Fourth, there was no witness to establish the chain of custody of the document from when it left Allen's office to when it entered Bedi's possession, and it is clear from the additional writing on the ledger that it was in another individual's possession in the interim. See ECF No. 58-2. These four facts clearly demonstrate that Romano did not make a prima facie showing that the document was what he claims it was: a complete ledger from SPA that was missing two transactions that appeared on a later ledger. Additionally, on the other side, there was no evidence that Romano offered from which the jury could reasonably find that this ledger was authentic. Accordingly, this evidentiary challenge is not a significant question that will allow Romano to be released pending appeal.

In sum, none of the arguments that Romano plans to raise on appeal qualify as significant questions under 18 U.S.C. § 3143(b). Nor do the alleged errors, when viewed cumulatively, suggest a different result. Indeed, Romano's argument on the point is a conclusory one and does not explain the culmination theory. Accordingly, Romano has not met his burden on this Motion.

26

## CONCLUSION

For the foregoing reasons, and to the extent outlined above, Romano's MOTION FOR RELEASE PENDING APPEAL (ECF No. 113) will be denied.

It is so ORDERED.

_____ /s/ _____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: June ___5___, 2023

27